# *Appendix E*

# SUMMARY OF PUBLIC HEARINGS ON COCAINE SENTENCING POLICY

## A. INTRODUCTION

The Commission held three public hearings in Washington, DC, on February 25, 2002, February 26, 2002, and March 19, 2002. It heard testimony from nineteen witnesses representing the federal judiciary, law enforcement agencies, private practitioners, the scientific and medical communities, academics, civil rights organizations, community representatives, and other interested parties.

Representing the Sentencing Commission at the hearing were Chair Diana E. Murphy; Vice Chairs Ruben Castillo, William K. Sessions, III, and John R. Steer; Commissioners Sterling Johnson, Jr., Joe Kendall, and Michael E. O'Neill, and *ex officio* Commissioners John P. Elwood and Edward F. Reilly, Jr.

## B. FEDERAL JUDGES

Senior Judge Richard P. Conaboy (M.D. Pa.), former Chairman of the U.S. Sentencing Commission, described his experience at the Commission in 1995 when they proposed a crack cocaine amendment. Judge Conaboy testified that the most basic argument for change is the need to let the guidelines work properly in determining proportionality and the appropriate sentence in each case. He maintained that the 100-to-1 drug quantity ratio should be changed.

Judge Sim Lake (S.D. Tex.), Chair of the Subcommittee on Sentencing Guidelines of the Committee on Criminal Law of the Judicial Conference of the United States, testified that the current ratio between crack cocaine and powder cocaine defendants "too severely punishes defendants who are responsible for crack cocaine." Judge Lake concluded by stating that the Criminal Law Committee would like to see Congress and the Commission act in concert with one another on this issue.

## C. LAW ENFORCEMENT

Larry D. Thompson, Deputy Attorney General, represented the U.S. Department of Justice. Mr. Thompson stated that current federal policy and the guidelines for sentencing crack cocaine offenses are appropriate. In support of the current penalty structure, the Department of

Justice indicated that crack cocaine is associated with greater dangers than powder cocaine since it is more psychologically addictive than powder cocaine and its low cost makes it particularly attractive to some of the more vulnerable members of our society. According to the Department of Justice, crack cocaine contributes heavily to the deterioration of neighborhoods and communities, including minority communities. Moreover, crack cocaine is associated with violent crime to a greater extent than powder cocaine and sentencing enhancements for weapons and bodily injury are not sufficient to account for all the differences because of the systemic nature of some of the harms.

If sentencing policy makers wish to address the disparity between crack cocaine and powder cocaine penalties, the Department of Justice stated that the penalty for powder cocaine offenses should be increased. Nevertheless, Mr. Thompson acknowledged that he was not aware of any specific information establishing that the existing powder cocaine penalties are too low.

Bridget Brennan, Special Narcotics Prosecutor for the City of New York, testified that the lowest level members of a narcotics organization tend to be street dealers, who often are addicts. She testified that an important part of her office's mission is to find alternatives to incarceration for addicts and low-level street dealers who are facing the threat of incarceration. Addicts and low-level street dealers often are enrolled in treatment programs such as "shock incarceration," which is a six-month rehabilitation program. She testified that, in her experience, federal and local authorities have targeted different offenders. She noted that in the last several years she has seen an increase in federal prosecutions of such offenders.

William J. Nolan, representing the Fraternal Order of Police, testified that his organization does not oppose addressing the disparate penalties associated with crack cocaine and powder cocaine offenses, but would do so by increasing the penalties for offenses involving powder cocaine. The Fraternal Order of Police indicated that any decrease in penalties would harm the overall effort to keep drugs off the street and violence out of the communities. Moreover, the dangers associated with cocaine have not completely disappeared. While crime rates have been reduced in recent years, illegal drugs still have a devastating impact on society.

## D. PRACTITIONERS

A. J. Kramer, the Federal Public Defender from Washington, DC, and Jon Sands, Assistant Federal Public Defender from Arizona, testified on behalf of the Federal Public and Community Defenders. The Defenders supported the modification or elimination of the 100-to-1 drug quantity ratio between powder cocaine and crack cocaine offenses. The Defenders stated that powder cocaine penalties should not be increased but that the crack cocaine penalties should be brought closer to powder cocaine penalties.

The Defenders argued that the current penalty structure leads to sentencing disparity among cocaine defendants within the country. They stated that the overwhelming majority of states do not differentiate between powder cocaine and crack cocaine. The Defenders maintained that the two drugs essentially are the same and should be punished similarly.

Furthermore, they indicated that another source of disparity arises out of the profit generated by the quantities for different drugs. For example, for quantities of drugs that are assigned to base offense level 26, for powder cocaine the typical trafficking profit is just over $50,000; for heroin the profit is $100,000; whereas for crack cocaine the profit is only approximately $600.

Irwin Schwartz, President of the National Association of Criminal Defense Lawyers (NACDL), supported modification of the 100-to-1 drug quantity ratio. NACDL stated that the average sentence for crack cocaine (119.5 months) is 55 percent higher than that for powder cocaine offenses (77 months). The NACDL argued that street-level crack cocaine dealers are punished more severely than major traffickers in wholesale quantities of powder cocaine. Thus, current sentencing policies and law enforcement practices operate in a racially disparate manner and erode public confidence in our criminal justice system, particularly in minority communities. The NACDL recommended that the drug quantity ratio be set as close to 1-to-1 as possible.

## E. Medical/Academic Communities

Dr. Glen Hanson, Acting Director of the National Institute on Drug Abuse, testified that stimulants continue to be the dominant drugs of abuse in this country. Although marijuana remains the most commonly used illicit drug, Dr. Hanson indicated that 1.2 million Americans used cocaine in 2000. Like other central nervous system stimulants, such as amphetamine and methamphetamine, Dr. Hanson noted that cocaine increases internal levels of the neurotransmitter dopamine, producing euphoria and increasing alertness and energy. In terms of pharmacological effects, crack cocaine is no more harmful than powder cocaine. Although cocaine in any form produces the same effects, the onset, intensity, and duration of its effects are related directly to the method of use and how rapidly cocaine enters the brain. Repeated use by any route of administration can produce addiction and other adverse health consequences, such as heart attack and stroke. Cocaine inhalation and intravenous usage produce the quickest and highest peak blood levels in the brain and share similar addictive potentials.

Dr. Hanson also noted that babies born to mothers who abused drugs during pregnancy often are delivered prematurely, have low birth weights, smaller head circumferences, and are shorter in length. There does appear to be an association between cocaine exposure and some developmental outcomes (*e.g.*, attention and emotional regulation).

Dr. Deborah Frank, Professor of Pediatrics at Boston University School of Medicine, described her study of developmental outcomes of inner city children exposed in utero to crack cocaine or powder cocaine. She testified that the biologic "thumbprint" of exposure to powder cocaine or crack cocaine in utero is identical and that there are no physiologic indicators identifying the form of the drug to which the newborn was exposed. Dr. Frank stated that based on years of careful research, the term "crack baby" is a grotesque media stereotype, not a scientific diagnosis. Compared to newborns exposed prenatally to opiates (such as heroin or methadone) who exhibit clinically obvious symptoms of drug withdrawal, an infant exposed to crack cocaine or powder cocaine will be clinically indistinguishable from other babies in a nursery. Dr. Frank added that small but identifiable effects of prenatal exposure to powder or

crack cocaine are prevalent in certain newborn outcomes, very similar to those associated with prenatal tobacco exposure, such as decreases in birth weight, length, or head circumference.

Dr. Ira J. Chasnoff, President of the Children's Research Triangle, stated that prenatal exposure to substances of abuse can have a significant effect on the long-term outcome of children. However, given that the physiology of crack cocaine and powder cocaine are the same and that changes in the fetal brain are similar whether the mother used crack cocaine or powder cocaine, it is impossible to differentiate the detrimental effects of any one specific drug from that of any other. Dr. Chasnoff noted that the home environment is *the* critical determinant of the child's ultimate outcome.

Dr. Alfred Blumstein, Professor of Urban Systems and Operations Research at Carnegie Mellon University, stated that the 100-to-1 drug quantity ratio conveys a strong sense of racial discrimination. The evolution of crack cocaine markets has resulted in a significantly lower level of violence today than that which characterized these markets' early years. Dr. Blumstein stated that it seems more rational to use sentencing enhancements to punish individuals who use violence, regardless of the drug type, rather than to base the sentencing difference on the chemical itself. Such enhancements should also account for an offender's role in the distribution hierarchy. Dr. Blumstein saw no reason why there should be any difference in sentencing guidelines between crack cocaine and powder cocaine offenses.

## F. Community Representatives and Interested Parties

Ronald Weich, Vice Chair for Government Relations of the American Bar Association (ABA), Criminal Justice Section, testified on behalf of the ABA. The ABA stated that the different treatment of crack cocaine and powder cocaine offenses has a clearly discriminatory effect on minority defendants. If, as the ABA suspects, there remains a strong empirical basis for reducing the disparity between the threshold quantities, it urged the adoption of a drug quantity ratio as close as possible to equalization. Finally, the ABA did not support increasing the penalties for powder cocaine offenses.

Laura Murphy, Director of the National Office American Civil Liberties Union (ACLU) testified on behalf of that organization. The ACLU opposed the disparity in sentencing for equal amounts of crack cocaine and powder cocaine. It viewed the mandatory minimum of five years for simple possession of more than five grams of crack cocaine as "extraordinarily harsh." The ACLU also was concerned that national drug policy, especially crack cocaine policy, is tinged with racial bias, despite numerous legislative efforts since 1995 to remedy the situation. The ACLU opposed increasing the penalties for powder cocaine offenses.

William D. McColl, Director of National Affairs, testified for the Drug Policy Alliance. The Drug Policy Alliance favored increasing crack cocaine mandatory minimum drug quantity thresholds without increasing penalties for powder cocaine offenses. States are adopting more of a treatment approach to drug defendants and, as reported by the Drug Policy Alliance, a number of states across the nation are re-examining sentencing schemes that relate to drug defendants, as well as mandatory minimum penalties.

Julie Stewart, President of Families Against Mandatory Minimums (FAMM), testified that the same organizing principle that applies to other drugs should also apply to crack cocaine offenses, *i.e.*, punish a mid-level dealer with a five-year minimum sentence and a high-level dealer with a ten-year minimum sentence. FAMM stated that the average quantity of crack cocaine handled by mid- and high-level dealers should determine the trigger quantity for five and ten-year penalties.

Jamie Fellner, U.S. Program Director and Associate General Counsel, testified on behalf of Human Rights Watch. The Human Rights Watch directed the Commission's attention to three treaties that it believed were relevant to federal narcotics sentencing: (1) The International Covenant on Civil Rights and Political Rights; (2) The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; and (3) The Convention on the Elimination of All Forms of Racial Discrimination. It indicated that the current federal sentencing structure violates two of the key human rights principles contained implicitly in those treaties: proportionality and nondiscrimination. Human Rights Watch recommended that sentences for crack cocaine offenders be equalized with those for powder cocaine offenders who engage in equivalent conduct and that this should be done by decreasing the penalties for crack cocaine offenses and not by increasing the penalties for powder cocaine offenses.

Wade Henderson, Executive Director, Leadership Conference on Civil Rights, stated that the 100-to-1 drug quantity ratio in is one of the most visible manifestations of racial disparity in the federal criminal justice system. According to the Leadership Conference on Civil Rights, there is no scientific or pharmacological evidence to justify treating crack cocaine as though it were a hundred times more dangerous than powder cocaine. Minorities almost exclusively are targeted for cocaine arrests and then are subject to a mechanical sentencing system with unacceptably high incarceration rates. The Leadership Conference on Civil Rights urged the repeal of mandatory sentencing laws and the elimination of the crack/powder cocaine disparity. "If anti-drug efforts are to have any credibility, especially in the minority communities, these penalties must be significantly revised."

Charles Kamasaki, Senior Vice President of the Office of Research, Advocacy, and Legislation at the National Council of La Raza, stated that his organization shared the concerns of other groups regarding the discriminatory effect of the 100-to-1 drug quantity ratio, but would oppose any attempt to reduce the disparities by increasing penalties for powder cocaine offenders. According to the National Council of La Raza, Hispanics accounted for approximately 25 percent of the Federal inmate population in 1997 and such statistics are largely the result of irregularities in drug enforcement. Moreover, Latinos are overly represented among

those convicted of powder cocaine offenses. It supported increasing crack cocaine mandatory minimum threshold quantities while maintaining the powder cocaine thresholds. The National Council of La Raza contended that the current penalty structure and ratio "severely undermine the credibility of and confidence in the nation's entire system of criminal justice."